# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned On Briefs July 31, 2013

## MALBRIE JANE FRANCIS, EXECUTRIX AND IN HER INDIVIDUAL CAPACITY v. JEFFERY C. BARNES, ET AL.

**Direct Appeal from the Chancery Court for Fayette County**
**No. 15599      Martha B. Brasfield, Chancellor**

---

**No. W2012-02316-COA-R3-CV - Filed September 23, 2013**

---

This appeal arises from an action filed by Plaintiff to set aside a quitclaim deed executed by Decedent conveying Decedent's home to her grandsons. Following a bench trial, the Chancery Court of Fayette County concluded that Decedent was incompetent to execute the deed and that the grandsons exercised undue influence over Decedent to obtain the deed. In a subsequent order, the trial court concluded that the grandsons intentionally defrauded Decedent to obtain Decedent's signature on the deed and ordered them to pay Plaintiff's attorney's fees. On appeal, the grandsons argue that the trial court erred in concluding that Decedent was incompetent to execute the deed and in concluding that the grandsons exercised undue influence over her to obtain the deed. Additionally, the grandsons contend that the trial court erred in concluding that they intentionally defrauded Decedent in order to obtain Decedent's signature on the deed and in ordering them to pay Plaintiff's attorney's fees. Additionally, Plaintiff contends that the grandson's appeal constitutes a frivolous appeal under Tenn. Code Ann. section 27-1-122. After thoroughly reviewing the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Lee S. Saunders, Somerville, Tennessee, for the appellants, Jeffery C. Barnes and Paul A. Barnes.

William S. Rhea, Somerville, Tennessee, for the appellee, Malbrie Jane Francis.

## OPINION

### I. Background and Procedural History

In 2002, at the age of 78, Annie Mae Park ("Ms. Park") executed her last will and testament leaving all of her real and personal property to her daughter Malbrie Jane Francis ("Mrs. Francis"), the Appellee. Ms. Park lived at 380 Dogwood Road in Fayette County with her two adult grandsons Paul and Jeffery Barnes (together, "the Barneses"); that property is the subject of this case. In 2008 and 2009, Ms. Park was diagnosed with both dementia and Alzheimer's. Though she was taking medication for each, her physical and mental health declined.

In April 2010, Ms. Park was hospitalized for pneumonia, severe emphysema, and other health complications. While Ms. Park was hospitalized, Paul Barnes arranged for her to execute a deed to her home to Jeffery Barnes. She executed that deed on April 18, 2010, while still hospitalized.[1] Sometime in the summer of 2010, Ms. Park became aware that the property was no longer in her name and enlisted the help of Mrs. Francis to get it back. At the insistence of Mrs. Francis, Jeffery Barnes deeded the home back to Ms. Park on September 29, 2010.

In October 2010, Paul Barnes contacted attorney William Bartholomew ("Mr. Bartholomew") about drafting legal documents for Ms. Park. On November 19, 2010, Ms. Park executed a quitclaim deed ("the November deed") conveying her home to the Barneses as tenants in common, subject to a life estate interest, for consideration of $10.00. When Ms. Park signed the November deed, Paul Barnes and Mr. Bartholomew were the only two individuals present with her. Mr. Bartholomew notarized the deed. Family members testified that, following the execution of the November deed, Ms. Park expressed to them that when she signed the deed, she thought she was signing documents related to her medicine and social security check.

On December 22, 2010, a social worker from Home Healthcare of West Tennessee visited Ms. Park and determined that her dementia had progressed to a point where she was no longer safe being in her home because the Barneses did not properly care for her and she could not care for herself. Subsequently, Ms. Park moved into the home of Mrs. Francis, where she remained until she passed away on February 13, 2011.

---

[1] Though purported consideration for the deed was $45,000, the actual consideration paid for the transfer was $100.

On February 23, 2011, Mrs. Francis filed a petition in her individual capacity and as executrix of Ms. Park's estate to have the November deed set aside on grounds of incompetency, undue influence, fraud, and inadequate consideration. After a bench trial, the trial court entered an order on March 22, 2012 setting aside the November deed. In the trial court's oral ruling, it found that Ms. Park was "incompetent and incapable of forming a contract" when she signed the November deed, and that the Barneses had exercised undue influence over her. In a subsequent order, on June 28, 2012, the trial court found that the acts of the Barneses throughout the course of 2010 were calculated to intentionally deceive Ms. Park into conveying the home to them. Based on those actions, the trial court found that the Barneses committed fraud and awarded attorney's fees to Mrs. Francis.

## II. Issues Presented

The following issues, as restated, are presented by the Appellants for our review:

(1)     Whether the trial court erred in finding that Ms. Park was incompetent to contract on November 19, 2010.

(2)     Whether the trial court erred in finding that Appellants unduly influenced Ms. Park to sign the deed on November 19, 2010.

(3)     Whether the trial court erred in finding that the Appellants committed intentional fraud by awarding the Appellee her attorney's fees.


Additionally, the Appellee contends that the Appellants' appeal is frivolous under Tenn. Code Ann. section 27-1-122.

## III. Standard of Review

This Court will review the trial court's findings of fact *de novo* upon the record, according a presumption of correctness to the findings. Tenn. R. App. P. 13(d); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citation omitted). We will not reverse the trial court's factual findings unless they are contrary to the preponderance of the evidence. *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). No presumption of correctness attaches to a trial court's conclusions of law. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citation omitted).

## IV. Analysis
## A. Competence

Both parties presented a great deal of lay and expert testimony regarding Ms. Park's mental capacity when she conveyed her home to the Barneses on November 19, 2010. After hearing the conflicting testimony, the trial court found that Ms. Park was incompetent and incapable of forming a contract on that date. The Barneses contend that the evidence does not support the trial court's finding. We disagree.

To be valid, a deed must be the result of the conscious, voluntary act of a grantor who has the capacity to contract.[2] *In re Conservatorship of Groves*, 109 S.W.3d 317, 351 (Tenn. Ct. App. 2003) (citing *Cason v. Cason*, 93 S.W. 89, 94 (Tenn. 1905)). To have the capacity to contract, a person must reasonably understand the nature, extent, character, and effect of the transaction. *Id.* (citing *Mays v. Prewett*, 40 S.W. 483, 484-85 (Tenn. 1897)). Thus, persons will be deemed incompetent to contract where "(1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or (2) when they are unable to act in a reasonable manner in relation to the transaction, and the other party has reason to know of their condition." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 297 (Tenn. Ct. App. 2001) (citing Restatement (Second) of Contracts § 15(1) (1981)).

"All adults are presumed to be competent enough to enter into contracts." *Id.* (citations omitted). Thus, the party seeking to invalidate the contract has the burden of proving that at least one of the contracting parties lacked requisite capacity when the contract was formed. *Id.* (citations omitted). It is not enough that the burdened party prove that the contracting party had senile dementia, instead they must prove that in light of all of the facts and circumstances, the contracting party was incompetent to engage in the transaction at issue. *Id.*

## 1.

First, the Barneses assert that the trial court erred by finding that Ms. Park's dementia was progressive and irreversible without first determining its cause. They contend that in some cases, dementia may be remitting or reversible depending on its cause. Therefore, they argue that the trial court erred when it relied on testimony of Ms. Park's capacity in April 2010 as evidence of her capacity in November 2010 because her dementia could have gone into remission in the interim. Specifically, the Barneses contend that the testimony regarding Ms. Park's mental capacity in April 2010 by Dr. Russell Bolyard, a clinical psychologist who

---

[2]Because a deed is contractual in nature, we employ the standards used to determine whether a person possess mental capacity to contract. *Richards v. Taylor*, 926 S.W.2d 569, 571 (Tenn. Ct. App. 1996) ("A deed is a contract.").

performed a psychological evaluation of Ms. Park on April 16, 2010, and Rose Callies, Ms. Park's nurse who visited her home weekly from July 2008 through April 2010, is irrelevant and/or misleading because neither interacted with Ms. Park between April and November 2010. Instead, the Barneses argue that the trial court should have relied on the testimony of Dr. Darrin Lyons, Ms. Park's primary care physician, and Dr. Valerie L. Augustus, a psychiatrist.

The Barneses' argument relies primarily on *In re Conservatorship of Groves*, in which this Court considered the dispute of two parties who filed competing petitions requesting to be appointed conservator for an elderly widow, Ms. Groves. *In re Conservatorship of Groves*, 109 S.W.3d 317, 325 (Tenn. Ct. App. 2003). The first issue before the *Groves* court was whether Ms. Groves lacked the capacity to manage her personal and financial affairs such that she needed a conservator. *Id.* at 327. Because Ms. Groves suffered from dementia, the court discussed the condition at length. *Id.* at 336-340. In its discussion of dementia, the *Groves* court explained that although most dementing conditions are not reversible, the current view of the American Psychiatric Association is that dementia may be progressive, static, or remitting, depending on its cause. *Id.* at 338 (footnote omitted). Where the condition is caused by depression, drug toxicity, polypharmacy, or other treatable medical conditions, persons may recover completely. *Id.* (footnote omitted). However, the court went on to note that although recovery is possible in limited circumstances, by far the most common cause of dementia is Alzheimer's disease, which is progressive and irreversible. *Id.*

Contrary to the Barneses' contention, *Groves* does not impose any requirement that a trial court determine the exact cause of a person's dementia before finding that it is progressive. In fact, after hearing witness testimony, the *Groves* court determined that Ms. Groves's mental state was "on a deteriorating course with no reasonable prospect for improvement" without determining the exact cause of her dementia. *Id.* at 343. Instead, the *Groves* court relied on witness testimony in finding that Ms. Groves' condition grew progressively worse over time. *Id.* at 343.

Here, the trial court similarly relied on witness testimony that Ms. Park's mental capacity grew progressively worse over time. Dr. Darrin Lyons was Ms. Park's primary care physician from March 2008 until her death. Dr. Lyons testified that he first diagnosed Ms. Park with dementia in March 2008 and indicated in later medical records that it was caused by Alzheimer's disease. Ms. Park's brother, Clay Webb testified that throughout 2010 her mental capacity declined; although Mr. Webb visited her nearly every day, she would claim she had not seen him in months. Two of Ms. Park's daughters, Georgia Elsworth and Neva Crow, and her granddaughter, Melissa Kenney, all testified that Ms. Park's mental capacity noticeably declined throughout 2010. Dr. Bolyard testified that based on his April 16, 2010

psychological evaluation of Ms. Park, her condition would not have improved by November of 2010. Ms. Callies testified that Ms. Park suffered from advanced dementia and Alzheimer's disease when they first met in 2008, and that those conditions progressed over time. Even the Barneses' own expert witness, Dr. Valerie L. Augustus, testified that Ms. Park's dementia would have progressed between April and November 2010, albeit only slightly.

The Barneses offer no evidence to suggest the cause of Ms. Park's dementia. Though they do offer evidence that Ms. Park was competent in November 2010, the Barneses do not offer any evidence that her mental condition changed or improved between April and November 2010. Upon review of all of the evidence in the record, we cannot say that it preponderates against the trial court's finding that Ms. Park's dementia was progressive. Therefore, the trial court did not err in relying on the testimony of Dr. Bolyard and Ms. Callies regarding Ms. Park's mental condition in April 2010.

The Barneses also contend that the trial court erred by rejecting the testimony of Dr. Lyons and Dr. Augustus. Despite the Barneses' contention to the contrary, there is nothing in the record to suggest that Dr. Lyons's testimony was rejected or ignored.[3] The trial court did expressly give more credence to Dr. Bolyard's testimony than Dr. Augustus's deposition testimony where the two conflicted. Normally, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). However, no presumption regarding credibility attaches when the testimony is admitted via deposition. *Estate of Fetterman v. King*, 206 S.W.3d 436, 445 (Tenn. Ct. App. 2006). Dr. Augustus testified through deposition, therefore we attach no presumption of correctness to the trial court's determination that her testimony was less credible than Dr. Bolyard's. However, because Dr. Augustus never met or interacted with Ms. Park and Dr. Bolyard did, we find no error in the trial court giving greater weight to Dr. Bolyard's testimony.

**2.**

The Barneses further argue that the trial court erred when it failed to identify a specific impairment of decision-making capacity that rendered Ms. Park incompetent to sign a contract on November 19, 2010. They contend that evidence of Ms. Park's functional

---

[3] In fact, though it did not refer to him by name, the trial court mentioned Dr. Lyons's testimony in its oral opinion when it stated that, "[W]e start off with . . . the doctor saying that Ms. Park had suffered dementia since 2008." We can easily infer that this is a reference to the testimony of Dr. Lyons because he diagnosed Ms. Park with dementia in 2008 and was the only testifying doctor that knew Ms. Park in 2008.

capacity, by itself, is not sufficient to support a conclusion that she was incompetent. The Barneses further contend that the preponderance of the evidence shows that Ms. Park had sound functional and decision-making capacity. Upon review of the record, we reject this argument.

A person's capacity encompasses two concepts: functional capacity and decision-making capacity. *In re Conservatorship of Groves*, 109 S.W.3d at 334. Functional capacity relates to a person's physical ability to take care of themselves and their property. *Id.* It can be determined by observing a person's ability to perform daily activities, such as maintaining personal hygiene, obtaining nourishment, and mobility. *Id.* Decision-making capacity relates to the person's mental ability to make and communicate decisions related to caring for themselves and their property. *Id.* at 335. Choices based on deranged or delusional reasoning or irrational beliefs may signal decision-making incapacity. *Id.* at 336. Functional impairments are relevant insofar as they have a tendency to bear upon the person's decision-making capacity, but alone will not render a person incompetent. *Keasler v. Estate of Keasler*, 973 S.W.213, 218 (Tenn. Ct. App. 1997) (citing *Harper v. Watkins*, 670 S,W,2d 611, 629 (Tenn. App. 1983).

The trial court noted that Dr. Lyons and Ms. Callies both testified that Ms. Park had dementia since 2008. It gave express credence to Ms. Callies's testimony that Ms. Park's dementia was fairly advanced in 2008 and had advanced since that time. The court noted Dr. Bolyard's testimony that when he examined her in April 2010, Ms. Park was severely impaired and needed a conservatorship. The trial court also noted several examples of Ms. Park's delusional and irrational reasoning. The court found that Ms. Park was paranoid in that people were stealing from her and had an unfounded fear of losing her medicine. Additionally, the trial court noted Melissa Kenney's testimony that she saw Ms. Park urinate into a can and then pour it out into the kitchen sink. Upon review of the record, we find that the trial courts discussions of Ms. Park's dementia and irrational behavior were sufficient examples of her impaired decision-making capacity sufficient to support a conclusion that Ms. Park was incompetent on November 19, 2010.

The Barneses argue that the preponderance of the evidence shows Ms. Park had sound functional and decision-making capacity. At trial, the witness testimony for each party presented strikingly different accounts of Ms. Park's capacity in 2010. Despite overwhelming testimony that Ms. Park declined mentally and physically late in her life, William Mullins, a family friend for nearly 40 years, testified that Ms. Park's mental capacity was no different in late 2010 than it was the first time he met her. Additionally, Mr. Mullins testified that Ms. Park competently took care of her legal business and property issues. However, Dr. Bolyard, Dr. Lyons, and Ms. Callies each recommended in 2010 that Ms. Park be appointed a conservator or moved into an assisted living facility. Georgia Elsworth and

Ms. Kenney each testified that Ms. Park could not use the restroom, and urinated into cans. However, William Phillips, whose wife occasionally cared for Ms. Park, testified that she had no problem using the restroom. In all, the trial court heard the live testimony of 24 witnesses regarding Ms. Park's competency on November 19, 2010 and made the factual determination that Ms. Park was incompetent on that date. Where the trial court makes factual determinations based on witness credibility, we will not reevaluate them absent clear and convincing evidence to the contrary. *Jones*, 92 S.W.3d at 838. We do not find any clear and convincing evidence that the trial court's findings based on the testimony at trial are incorrect. Based on those findings and the foregoing evidence, we cannot say that the evidence preponderates against the trial court's finding that Ms. Park lacked the functional and decision-making capacity to contract on November 19, 2010.

**3.**

The Barneses argue that the trial court abused its discretion by disregarding the presumption that arose when Mr. Bartholomew, in his capacity as a notary public, certified the instrument and affixed his seal. They contend that without rebutting the presumption that Mr. Bartholomew performed his duties correctly, there is no basis to conclude that the November deed was invalid. We disagree.

When a notary public properly acknowledges a instrument he or she "says to the world that the execution of the instrument was carried out according to law," and anyone who relies on the instrument should be able to assume its validity. *In re Marsh*, 12 S.W.3d 449, 453 (Tenn. 2000) (quoting *Beazley v. Turgeon*, 772 S.W.2d 53, 59 (Tenn Cr. App. 1988)). Because a notary public is a public official of the state of Tennessee and discharges his or her duties under oath, it is presumed that they perform their duties correctly. *Id.* at 453. However, that presumption of correctness may be rebutted by the party challenging the document. *Manis v. Farmers Bank of Sullivan Cnty.*, 98 S.W.2d 313, 314 (Tenn. 1936).

We find the Barneses' assertion that the trial court "totally disregard[ed]" Mr. Bartholomew's acknowledgment of the November deed to be untrue. The trial court discussed Mr. Bartholomew's interactions with Ms. Park and found that he was not able to recognize the extent of her dementia. Additionally, the trial court found "clear, cogent, and convincing evidence that Ms. Park was incompetent and incapable of forming a contract" on November 19, 2010. Though the trial court did not find that Mr. Bartholomew engaged in any intentional wrongdoing, it did find sufficient evidence to rebut the presumption of validity that his acknowledgment of the November deed carried.

We find that the trial court did not err in reaching its conclusion that Ms. Park was incompetent to contract on November 19, 2010. Additionally, after reviewing the record, we find that the preponderance of the evidence supports the trial court's conclusion. We

therefore affirm the trial court's decision to set aside the November deed.

## B. Undue Influence

The Barneses further argue that the trial court erred in finding that they exerted undue influence over Ms. Park in obtaining her signature on the November deed. They assert that Mrs. Francis failed to establish that they exercised dominion and control over Ms. Park. In the alternative, the Barneses contend that, even if a presumption of undue influence was raised in the transaction, it was rebutted by clear and convincing proof that the transaction was fair.

Undue influence is most commonly established "by proving the existence of suspicious circumstances warranting the conclusion that the [action] was not the [grantor's] free and independent act." *Estate of Hamilton v. Morris*, 67 S.W.3d 786, 792 (Tenn. Ct. App. 2001) (quoting *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989)). Some of the most frequently used suspicious circumstances include (1) the existence of a confidential relationship, (2) poor physical and mental condition of the grantor, and (3) the beneficiary's involvement in the procurement of the transaction. *Id.* Other recognized suspicious circumstances include the grantor's advanced age, the unjust or unnatural nature of the document's terms, discrepancies between the transaction and the grantor's expressed intentions, and fraud or duress directed towards the grantor. *See Kelley v. Johns*, 96 S.W.3d 189, 196 (Tenn. Ct. App. 2002) (citations omitted). There is no prescribed number of suspicious circumstances required to invalidate an action, but in order for the doctrine of undue influence to apply, there must be a confidential relationship between the parties. *In re Estate of Brevard*, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006). Once a presumption of undue influence is raised, the dominant party must prove by clear and convincing evidence that the transaction was fair. *Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn. 1995).

### 1.

Undue influence can only be found where a confidential relationship exists, therefore we start by determining whether Ms. Park and the Barneses were in a confidential relationship. The trial court found that there was a confidential relationship between Ms. Park and the Barneses. Whether or not a confidential relationship exists is a question of fact. *Matlock*, 902 S.W.2d at 385. Therefore, we review the trial court's finding with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d).

Confidential relationships may be found where there is either a legal or family relationship between the parties. *In re Estate of Brevard*, 213 S.W.3d at 302 (quoting

*Matlock* 902 S.W.2d at 385-86). However, family relationships are not *per se* confidential; a family relationship must be coupled with proof of dominion and control in order to establish a confidential relationship. *Id.* (quoting *Matlock*, 902 S.W.2d at 385-86). Proof of the confidential relationship alone, however, does not establish a presumption of undue influence unless it is accompanied by some other suspicious circumstance. *Id.*

It is undisputed that, as the grandsons of Ms. Park, the Barneses had a family relationship with her, therefore we move directly to dominion and control. Dominion and control is an issue of fact. *Id.* at 304. Therefore we will not disturb the trial court's ruling that the Barneses did exercise dominion and control over Ms. Park unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). The Barneses contend that the proof shows they did not exercise dominion and control over Ms. Park. They point to testimony that Ms. Park was capable of walking throughout the house, was mentally alert, and was not mistreated by the Barneses. They note that they did not control access to Ms. Park, and several witnesses testified that she wanted the Barneses to have the house after she died. However their evidence is refuted by the testimony offered by Mrs. Francis. Multiple witnesses testified that the brothers exercised dominion and control over Ms. Park. Melissa Kenney, Ms. Park's granddaughter, testified that Ms. Park was terrified of her grandsons and asked Ms. Kenney to stop visiting because it made Paul Barnes angry. Two of Mrs. Park's daughters, her brother, and her nurse testified that on separate occasions, they each heard Paul Barnes express dismay that Ms. Park had not died yet. Nurse Callies documented in notes from two 2009 visits that Ms. Park was afraid of her grandsons. Terry Dycus served as Ms. Park's court appointed Guardian ad Litem in January 2011, after she moved in with Mrs. Francis. Mr. Dycus testified that during his first visit with Ms. Park, she received a phone call from one of the Barneses. Mr. Dycus said that upon being told the Barneses were calling, Ms. Park started trembling, immediately curled up in the fetal position, and said, "Leave me alone. I'm scared of them." Based on this and other evidence, the trial court determined that the Barneses were able to influence Ms. Park in a manner that constituted dominion and control. We do not find the preponderance of the evidence is otherwise, therefore we uphold the trial court's finding that Ms. Park and the Barneses were in a confidential relationship.

**2.**

Proof of a confidential relationship between the Barneses and Ms. Park is not, by itself, enough to establish that they exerted undue influence over her with regard to the November deed. There must be some other proof of suspicious circumstances that could prompt the trial court to conclude that Ms. Park's execution of the November deed was not her free and independent act. *In re Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001). The Appellee's evidence establishes six other suspicious circumstances that indicate

the Barneses exerted undue influence on Ms. Park.

First, on November 19, 2010, Ms. Park was 87 years old and in declining mental and physical health. Second, leaving the home to the Barneses was inconsistent with Ms. Park's express intentions. The deed left the home to the Barneses while retaining a life estate, even though her Last Will and Testament, executed in 2002, named Mrs. Francis the sole beneficiary of her estate. Ms. Park's other daughters testified that Ms. Park had explained to them she was leaving her property to Mrs. Francis because of the financial support Mrs. Francis had given her over the years. Mrs. Francis was listed on Ms. Park's bank account and had a key to her safe deposit box. Third, leaving the home to the Barneses was inconsistent with the relationship she had with them. Shortly after executing the November deed, a social worker determined that Ms. Park needed to be removed from the home because she was not receiving adequate care from the Barneses. Fourth, the November deed was the third attempt by the Barneses to get the home from Ms. Park. In April of 2010, Ms. Park deeded the house to Jeffery Barnes, which he reluctantly conveyed back to her on September 29, 2010. Prior to that, in late 2009 or early 2010, Ms. Park found a handwritten will purporting to leave the majority of her assets to the Barneses in a stack of papers requiring her signature. Ms. Park suspected and the trial court found that Paul Barnes wrote the will in the first of his attempts to obtain the home. Fifth, it was Paul Barnes, not Ms. Park, who contacted Mr. Bartholomew about drafting the deed and only Mr. Bartholomew and Paul Barnes were present when Ms. Park signed the deed. Sixth, Ms. Park's brother and granddaughter each testified that on separate occasions shortly after signing the November deed, Ms. Park told them that she had been under the impression that the deed was a form she had to sign to keep her medicine and social security from being cut off. Based on those facts, we agree with the trial court's finding that the circumstances surrounding Ms. Park's signing of the November deed were suspicious.

**3.**

A confidential relationship, coupled with suspicious circumstances, raises a presumption of undue influence. *In re Estate of Brevard*, 213 S.W.3d at 302. When a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995). To prove fairness, the dominant party may show that the weaker party received independent advice before engaging in the transaction. *Childress v. Curry*, 74 S.W.3d 324, 328 (Tenn. 2002).

The Barneses contend that because Ms. Park received free and independent advice of counsel, any presumption of undue influence is rebutted. Mr. Bartholomew testified that he fully advised Ms. Park regarding the legal consequences of the deed. The trial court was

unpersuaded, finding that Mr. Bartholomew was unable to recognize the severity of Ms. Park's mental condition and that any advice she received under the circumstances was inappropriate. Additionally, the trial court noted Paul Barnes's presence when Ms. Park signed the deed as evidence that her actions were influenced. This evidence falls short of establishing clear and convincing evidence that the transaction was fair. Accordingly, we affirm the trial court's decision to set the November deed aside based on undue influence.

## C. Intentional Misrepresentation[4]

We now move to the trial court's finding that the Barneses committed intentional misrepresentation and awarding attorney's fees to Mrs. Francis on that basis. The Barneses first contend that the trial court applied an incorrect legal standard because intentional misrepresentation induces a person to exercise his free will mistakenly, whereas the use of undue influence acts to overcome a person's free will; thus, the two are mutually exclusive. Second, they argue that because the trial court did not establish that Mr. Bartholomew failed to act lawfully as Ms. Park's attorney or as notary for the November deed, it must be presumed that he performed all of his duties correctly and lawfully, therefore there is no basis for the trial court to find intentional misrepresentation.

The Barneses' argument that undue influence and intentional misrepresentation are mutually exclusive has no merit. Fraud (intentional misrepresentation) has been widely recognized in Tennessee as one of the suspicious circumstances that may be relied upon to establish undue influence. *Kelley v. Johns*, 96 S.W.3d 189, 196 (Tenn. Ct. App. 2002) (citing *Halle v. Summerfield*, 287 S.W.2d 57, 61 (Tenn. 1956); *In re Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001)). Because intentional misrepresentation cannot be both a factor in establishing undue influence and mutually exclusive with it, we find that argument has no merit. We will now examine whether the trial court's finding of intentional misrepresentation was proper.

To recover for intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was

---

[4]The parties and trial court refer to the cause of action as fraud. "Fraud" and "intentional misrepresentation" are different names for the same cause of action. *Hodge v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012). In order to avoid confusion, the Tennessee Supreme Court has suggested that the term "intentional misrepresentation" be used exclusively henceforth. *Id.* at 342-43.

justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation. *Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012) (citing *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008)). Because intentional misrepresentation by its nature is difficult to prove, Tennessee courts recognize that it may be properly proved wholly by circumstantial evidence. *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001).

Though our inquiry is limited to those representations made surrounding the execution of the November deed, the Barneses' actions in prior attempts to gain ownership of the home provide useful circumstantial evidence of their *modus operandi*. In late 2009 or early 2010, Ms. Park found a handwritten will purporting to leave the majority of her assets to the Barneses among a stack of papers needing her signature. Ms. Park suspected and the trial court concluded that Paul Barnes wrote the will in the first of his attempts to get the home. In April of 2010, while Ms. Park was hospitalized for pneumonia, severe emphysema, and other health complications, Paul Barnes arranged and paid for Fayette County Title Company to prepare a deed to convey Ms. Park's home to Jeffery Barnes. Ms. Park executed that deed for consideration of $100 while she was still hospitalized. Following the execution of that deed, Ms. Park called Lena Parker, an employee in the Fayette County Trustee's Office. Ms. Parker testified that Ms. Park wanted the property back in her name and that the brothers had told her when executing the deed that if she did not sign the document she would lose her medicine and social security check. On September 29, 2010, Jeffery Barnes conveyed the property back to Ms. Park.

In October 2010, Paul Barnes contacted Mr. Bartholomew about drafting some legal documents for Ms. Park. Mr. Bartholomew met with Ms. Park on three occasions and testified that he fully advised Ms. Park regarding the legal consequences of the deed. The Barneses argue that because Mr. Bartholomew competently advised Ms. Park and properly performed his duties as a notary public, there can be no finding of intentional misrepresentation. The trial court was unpersuaded, finding that though Mr. Bartholomew had no part in the scheme, he was unable to recognize the severity of Ms. Park's mental condition and that any advice she received from him under the circumstances was inappropriate. We are similarly unpersuaded. While Mr. Bartholomew's correct performance of his duties supports the Barneses' claim that the deed was valid, it does not preclude a finding otherwise.

On November 19, 2010, Ms. Park conveyed the home by quitclaim deed to the Barneses for $10, subject to a life estate interest. Much like she did following the execution of the April deed, Ms. Park expressed shortly thereafter that she thought it was a document regarding her medicine and social security. The trial court found that Ms. Park's mistake regarding the contents of the document was the result of misrepresentations made by the

Barneses, and that her reliance on them was reasonable, considering her diminished mental capacity. It further found that the actions leading up to Ms. Park's execution of the November deed were "well thought out and well planned to get this house into the name of the Barneses." The trial court concluded, based on the circumstantial evidence, that the Barneses intentionally deceived Ms. Park into deeding them the house against her will. Because the evidence does not preponderate against that finding, we affirm and uphold the trial court's judgment.

Additionally, we uphold the trial court's award of attorney's fees. The Tennessee Supreme Court has held that the recipient of an intentional misrepresentation is entitled to recover the pecuniary loss to him of which the misrepresentation is a legal cause, including pecuniary loss suffered as a consequence of the recipient's reliance. *Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012) (citing *Boling v. Tennessee State Bank*, 890 S.W.2d 32, 35-36 (Tenn. 1994)). Additionally, we recognize that where property is wrongfully obtained through intentional misrepresentation, the sole way of dispelling another party's wrongful assertion of title is by hiring an attorney and litigation; otherwise, there is a risk of losing title by adverse possession. *Ezell v. Graves*, 807 S.W.2d 700, 703 (Tenn. Ct. App. 1990). Therefore, the costs of litigation flow directly from the defendant's conduct; they represent an actual pecuniary loss that should be recoverable. *Id.* Where attorney's fees are authorized by law, the trial court's decision to award them will not be reversed on appeal absent abuse of discretion. *Martin v. Moore*, 109 S.W.3d 305, 313-14 (Tenn. Ct. App. 2003) (citation omitted). We will only find an abuse of discretion where the court "applied incorrect legal standards, reached an illogical conclusion, based its discretion on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party." *Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011) (quoting *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn 2008)). Here, the trial court's award of attorney's fees to Mrs. Francis is authorized as a recoverable pecuniary loss resulting from the Barneses' intentional misrepresentations. We do not find that the trial court erred in reaching its decision or that it causes an injustice to the Barneses. The Barneses offer no evidence that the trial court's award of attorney's fees was excessive. Therefore, we find that the trial court did not abuse its discretion and uphold its award of attorney's fees to Mrs. Francis.

### D. Frivolous Appeal

Mrs. Francis contends that this appeal of the trial court's decision is frivolous under Tenn. Code Ann. section 27-1-122, which provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon

-14-

motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122 (2000 & Supp. 2012). When considering whether an appeal is frivolous, we must take care to avoid discouraging legitimate claims. *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 342 (Tenn. 2010). "Consequently, imposing a penalty for a frivolous appeal is a remedy which is to be used only in obvious cases of frivolity and should not be asserted lightly or granted unless clearly applicable–which is rare." *Id.* (citing *Wells v. Sentry Ins. Co.*, 834 S.W.2d 935, 938-39 (Tenn. 1992). Mrs. Francis contends that the Barneses' appeal is frivolous because they raise numerous issues of fact for which there is abundant evidence in support of the trial court's decision. While the preponderance of the evidence does support the findings of the trial court, we are not prepared to rule that the Barneses' evidence is so far outweighed as to make this appeal frivolous.

## V. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are taxed to the Appellants, Jeffery C. Barnes and Paul A. Barnes, and their surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE
