**In re The ESTATE OF Sherman FETTERMAN by Glenda FETTERMAN and Kendra Marlow**

**v.**

**Johnny KING.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

April 3, 2006 Session.

May 15, 2006.

Rehearing Denied May 26, 2006.

Permission to Appeal Denied by Supreme Court Oct. 2, 2006.

Johnny V. Dunaway, LaFollette, Tennessee, for the Appellant Johnny King.

Stephen W. Gibson, Ronald L. Grimm, and John B. Fowler, Knoxville, Tennessee, and George H. Buxton and Harold P. Cousins, Jr., Oak Ridge, Tennessee, for the Appellee The Estate of Sherman Fetterman by Glenda Fetterman and Kendra Marlow.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

This lawsuit involves a claim for attorney fees filed by the Estate of Sherman Fetterman (the "Estate") against John King ("King") and seeks payment for legal services provided by Sherman Fetterman ("Fetterman") prior to his death. The legal services were provided over several years while Fetterman was assisting in King's ultimately successful attempt to secure a landfill permit in Scott County, Tennessee. After the first trial, the Trial Court enforced a written contract between Fetterman and King and awarded the Estate the contract value of $800,000. We concluded in the appeal of that judgment that the contract was not enforceable for various reasons, and, therefore, we reversed the Trial Court's judgment and remanded the case to the Trial Court to determine the quantum meruit value to King of Fetterman's legal services. Following a second trial, the Trial Court awarded the Estate $350,000, plus pre-judgment interest at 10%, bringing the total judgment to $587,424.54. We affirm the Trial Court's judgment as modified.

### Background

This is the second appeal to this Court in this litigation involving the amount of attorney fees owed by King to the estate of one of his former attorneys, Sherman Fetterman, who died on October 27, 1997.

The underlying facts were set forth concisely in our Opinion in the first appeal, *In re The Estate of Sherman Fetterman v. Johnny King*, No. E2003–02081–COA–R3–CV, 2004 WL 1906449 (Tenn.Ct.App. Aug. 26, 2004), *no appl. perm. appeal filed* (hereafter "*Fetterman I* "). We quote liberally from *Fetterman I* to set forth the general background as relevant to the present appeal, with all footnotes contained within the quote being in the original:

In this action, the determinative issue on appeal is the amount of attorney's fees owing to the Estate of a deceased lawyer by defendant, a client of the deceased.

Following trial, the Trial Judge essentially enforced a written Contract of Employment between the parties, and awarded the Estate $800,000.00 plus pre-judgment interest. The agreement enforced by the Trial Court provides in pertinent part:

That Johnny King engaged the services of Sherman Fetterman, attorney at law, in relation to the acquisition of certain properties; to negotiate with state agents; and to represent the interests of Johnny King, et al., before other governmental bodies, and in any other capacity required, all for the purpose of establishing a solid waste disposal facility (landfill).

That Johnny King and Sherman Fetterman, aforementioned, agreed in lieu of compensation for legal services rendered to Johnny King, that Johnny King shall provide to Sherman Fetterman an ownership interest of any company or partnership, or corporation, public or private, formed for the purposes of establishing a solid waste disposal facility (landfill).

Additionally, the parties agreed that Sherman Fetterman would function as

attorney for any organization or business formed, as aforementioned. The Agreement provides:

> The ownership interest of Sherman Fetterman shall be twenty percent (20%), and said ownership interest shall be evidenced by stock certificates in the event a corporation is formed; or proper documentation acknowledg[ing] the ownership interest in the event a partnership or non-incorporated company is formed.

The document was signed by Sherman Fetterman and Johnny King, on September 22, 1990.

The record establishes that the deceased and defendant entered into an attorney/client relationship beginning in 1987[1], and the attorney provided legal services in efforts to acquire property, negotiating with state agencies and governmental bodies, to the end of establishing a sanitary landfill or a disposal facility in Scott County, Tennessee. The attorney's efforts were initially undertaken with the agreement to obtain a 10% interest in any business entity that might be formed to establish such a landfill or disposal facility, but in January of 1989 Fetterman wrote defendant King, advising that he would not further represent King in these matters until the terms of his representation were "renegotiated", which apparently led to the fee arrangement set forth in the quoted contract.

Fetterman's efforts to obtain a permit for a landfill were unsuccessful, but he filed a lawsuit on defendant's behalf against Scott County on March 9, 1990. After the County filed a Motion to Dismiss on March 26, 1990, a voluntary non-suit was entered in return for the County's withdrawal of its Motion to Dismiss and/or for Summary Judgment. Defendant then employed George P. Dillard, an Atlanta attorney, and J. Douglas Overbey, a Knoxville attorney, to pursue the action against Scott County, and they filed an action on defendant's behalf against Scott County and the town of Winfield, as defendants. Subsequently, these attorneys asked Fetterman to serve as local counsel, which he accepted.

Fetterman accepted a position as a full time attorney in the Public Defender's Office in 1992.[2] Defendant Scott Waste Disposal Company was chartered in 1995, and the State granted a landfill permit to Scott Waste Disposal Company on April 29, 1997. On September 23, 1998, defendant sold his stock in Scott Waste Disposal Company to Liberty Waste Services of Tennessee, Inc., for four million dollars.

The Trial Court heard evidence from the Estate that defendant owed the Estate $250,000.00 for the deceased's legal services, in addition to the contractual fee of 20% of the stock in the landfill company. The Court also heard evidence from defendant that shortly prior to Fetterman's death on October 27, 1997, that defendant and Fetterman had agreed to settle all of Fetterman's claim for legal fees for $250,000.00.

The Estate offered the expert testimony of James Webster, an attorney, who opined that the contractual fee was reasonable. He testified that he based his judgment on examining boxes of documents that the deceased's daughter

---

1. Deceased graduated from The Nashville School of Law and was licensed to practice law in the State of Tennessee in 1987.

2. A public defender is prohibited from practicing law, but is allowed a reasonable time to conclude or transfer his cases. Tenn.Code Ann. § 8–14–202[ (c)].

had compiled relating to the landfill matter and Johnny King, as well as interviewing people in Scott County about the matter and reading newspaper articles.

The Trial Court declined to award the additional $250,000.00 claimed by the Estate, and refused to find the deceased had agreed to accept $250,000.00 as payment for all of his legal services. The evidence does not preponderate against the Trial Court's finding on these issues. Tenn. R.App. P. 13(d). The Trial Court then found the contractual fee to be reasonable, and entered Judgment for the Estate based on the Contract.

*Fetterman I*, 2004 WL 1906449, at **1, 2.

After setting forth the above facts, we noted that Fetterman's having withdrawn from his representation of King before the formulation and sale of the corporation was a compelling reason not to enforce the contract as written. *Id.*, at *5. We also concluded that Fetterman had not fully performed his part of the contract because he began working full-time for the Public Defender's office several years before the corporation was formed and later sold. *Id.* For these reasons, we determined that the Estate should recover a lesser fee than what was called for in the contract. We stated:

> [W]e conclude that the Judgment of the Trial Court should be vacated and the cause remanded, to establish a fee for Fetterman's Estate, based upon quantum meruit, which fee will be established on the value of the benefit conferred to the client, rather than the value of the services to the attorney who performed them. *See, Castelli v. Lien*, 910 S.W.2d 420, 428 (Tenn.Ct.App.1995).

*Fetterman I*, 2004 WL 1906449, at *5.

Pursuant to our instructions, on remand the Trial Court conducted a trial to determine the quantum meruit value of Fetter-

man's services. Following the trial, the Trial Court concluded that the quantum meruit value of Fetterman's services, based on the value to King, was $350,000. The Trial Court also awarded prejudgment interest at the rate of 10% as of September 23, 1998, the date the corporation was sold. The prejudgment interest amounted to $237,424.54 and resulted in a total judgment to the Estate of $587,424.54. King appeals raising two issues. King claims that the Trial Court's award of $350,000 was excessive, and that the Trial Court further erred when it awarded prejudgment interest.

### *Discussion*

 The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R.App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn.2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn.2001).

The Tennessee Supreme Court has adopted a specific rule which offers guidance in assessing a reasonable attorney fee. Supreme Court Rule 8, Rules of Professional Conduct Rule 1.5 provides:

> **Rule 1.5. Fees**—(a) A lawyer's fee and charges for expenses shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
>
> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) Whether the fee is fixed or contingent;

(9) Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) Whether the fee agreement is in writing.

(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in writing, signed by the client, and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of litigation, settlement, trial, or appeal; other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and whether there was a recovery, and showing the remittance, if any, to the client and the method of its determination.

Numerous witnesses testified at trial, and the deposition testimony of several other witnesses also was presented. We will summarize the main aspects of the relevant testimony. The first live witness was Anna Ruth Clark ("Clark"), who was called as a witness for the Estate. Clark testified that she worked part-time as Fetterman's secretary from 1989 through 1993 or 1994. Clark stated that during the landfill permit process, King frequently was at Fetterman's office. According to Clark, while Fetterman was representing King, Fetterman went to Nashville numerous times and also to various County Commission meetings. Fetterman also met with the representatives of the City of Caryville and the City of Winfield. Clark did not recall any time while she worked for Fetterman when Fetterman was not representing King. Clark stated that for "some period of time," all she did was work on the legal matters involving the landfill permit. Fetterman had several other legal assistants who also worked on various matters.

The next witness for the Estate was James Webster ("Webster"), a licensed attorney who practices law in Anderson County, Tennessee. Webster testified that his most recent "assignment" was after this Court's first opinion was released. Webster was called upon to "look at and consider benefits that may have been conferred to Mr. King here as a result of the efforts of Mr. Sherman Fetterman." Webster stated that he reviewed the entire court file in the lawsuit filed in Scott County which eventually resulted in the landfill permit being issued. Webster also re-

viewed the transcript from the first trial, the closing documents from King's sale of the landfill, as well as various other documents including depositions and the like.

Webster stated that Fetterman performed significant legal work before the lawsuit filed by Fetterman on King's behalf against Scott County actually was filed. For example, a motion for summary judgment was filed by Fetterman which contained numerous pre-litigation exhibits including transcripts and other documents from the administrative hearings. Webster stated that from the time the complaint was filed up until shortly before the motion for summary judgment was heard, Fetterman was King's sole attorney in this matter. The motion for summary judgment was argued initially on King's behalf shortly after attorney George Dillard ("Dillard") became involved in this case. When the motion for summary judgment was first heard, the trial court inquired about whether any additional evidence would be presented. Webster noted that Dillard, who had been in the case as King's attorney for about a month, indicated that all of the necessary evidence was contained in the motion for summary judgment and no new evidence would be presented. The trial court did not rule on the motion at that time but allowed the County additional time to present any new evidence.

Webster pointed out that while Dillard was responsible for amending the complaint twice after the motion for summary judgment was filed, the amended complaints were signed on King's behalf by Dillard, Fetterman, and Knoxville attorney Doug Overbey ("Overbey"). Webster emphasized that in the complaint as originally filed by Fetterman, the relief requested was a determination that the administrative body had acted arbitrarily, capriciously, and with prejudice when denying the application for a landfill permit. Although

the motion for summary judgment was denied, the trial court's final opinion following the trial concluded that the denial of the permit indeed was arbitrary and the "plaintiff satisfactorily carried his burden of proof." Thus, according to Webster, "the end result was what [Fetterman] was asking for in his initial Complaint" which was filed before Dillard became involved in the lawsuit.

Webster believed that Fetterman knew what he was doing and Webster disagreed with the assessment of Dillard and others who believed otherwise. Webster noted that King sought Fetterman's services after King initially and unsuccessfully tried to obtain the permit. According to Webster, "the landfill process was a very controversial, very political, very heated, very disliked process ... in Scott County." Fetterman "put together the process to obtain a landfill [permit] and was ultimately successful." Webster emphasized that the critical part of the whole process was the work that was performed prior to the actual lawsuit being filed, and during this time Fetterman was King's sole attorney on this project. Webster concluded that the benefit to King from Fetterman's work was King's ability to sell a landfill and a permit for approximately eight million dollars. Webster stated that "in sum and substance, ... Johnny King benefitted in the range of about seven point nine to eight million dollars from the transaction."

Webster was asked about Supreme Court Rule 8, Rules of Professional Conduct Rule 1.5, *supra*, which sets forth various factors to be considered when determining the amount of a reasonable attorney fee. Webster stated that Fetterman put significant time into representing King and the issues involved in that representation were not common. The landfill was highly controversial and there was "no political support whatsoever for the

landfill." As a result, Webster concluded that Fetterman was not going to receive some cases he might otherwise have received because he was "the landfill lawyer." Webster stated that King's resources were limited at the beginning and so he needed a lawyer that would "work with him as well and invest in the lawsuit from that standpoint, invest his time." Webster also believed that more experienced attorneys may not have taken the case because it was a difficult case and the likelihood of success was not strong. After considering the various factors set forth in Rule 1.5, Webster concluded that an attorney fee to the Estate of eight hundred thousand dollars ($800,000) would be fair and reasonable. In reaching this conclusion, Webster considered the work performed by each of King's various attorneys involved in this matter.

On cross-examination, Webster acknowledged that after attorneys Dillard and Overbey became involved in the litigation, various forms of discovery were undertaken such as interrogatories and requests for admissions, and several key motions *in limine* were filed. Webster also admitted that there did not appear to be anything in the court file indicating that Fetterman performed any work for King after 1992. Although Fetterman was present at the trial in November of 1992, he did not actively participate in that trial.

Liberty Waste Management Services of Tennessee ("Liberty Waste") is the company that purchased the landfill and permit from King. Liberty Waste's CEO at the relevant time was Jeffrey Kendall ("Kendall"), whose deposition testimony was admitted at trial. Kendall testified that the cornerstone of the deal was the landfill and the permit, although the garbage hauling company owned by King's wife was a "plus." When asked if Liberty Waste would have been interested in acquiring the land etc., in the absence of the permit, Kendall responded "absolutely not." Kendall stated he would allocate the "lion's share" of the purchase price to the permit, stating Liberty Waste "did this deal primarily for the permit." According to Kendall, from the purchase price paid by Liberty Waste, the "minimum value" he would allocate to the permit was $4 million.

King called Knoxville attorney Thomas Scott ("Scott") as an expert regarding the quantum meruit value of Fetterman's services. Scott stated that Fetterman was an inexperienced attorney when he first began his representation of King.[3] Scott believed that Fetterman was unable to carry the litigation all the way through a trial. According to Scott, the litigation was "taken to a different level" once Dillard began representing King. Scott described Dillard as an expert in the field and described Dillard's work as "head and shoulders above" the work performed by Fetterman. After reviewing all of the pertinent evidence, Scott concluded that the quantum meruit value of Fetterman's services to King totaled $75,000.00.

During the relevant time frame, James L. Cotton, Jr., ("Cotton") represented the City of Winfield in its opposition to the landfill permit being issued.[4] Cotton's deposition testimony was admitted at trial. In his deposition, Cotton discussed the history of the litigation both prior to and after the complaint was filed. Cotton stated that the case "really revved up to another level" when Dillard became involved

3. As noted in *Fetterman I,* 2004 WL 1906449, at *1, Fetterman began representing King in this matter shortly after Fetterman became licensed in 1987.

4. While the lawsuit filed by Fetterman was proceeding, James Cotton became a General Sessions Court Judge in Scott County.

and amended the complaint. Cotton stated that he and his co-counsel became concerned when Dillard infused constitutional issues into the case because they thought those issues had some merit. Cotton also acknowledged that Dillard indicated to the trial court at the initial summary judgment hearing that no evidence would be presented in support of that motion other than what was already in the record. Cotton also stated that the landfill issue was "[e]xtraordinarily unpopular" and that Fetterman "was brave in taking on the issue. I thought it took a lot of guts."

King also called accountant Herbert Tamer as an expert witness. Tamer explained that when the landfill was sold by King, the entire sale price was eight million dollars. However, a significant portion of the sale price was not allocable to the permit itself. When the sale occurred, King's wife also sold her interest in a company called Quick Garbage which accounted for $2 million of the sale price. In addition, $2 million was allocated to the purchase of land and King's interest in that land totaled $900,000. According to Tamer, of the remaining $4 million, King was still owed over $2.4 million from the sale. Of this $2.4 million, approximately $331,000 was past due with the remaining amount yet to come due. Tamer noted that King was currently in litigation to recover the past due amount. Tamer believed that only $900,000 of the $8 million dollar sale price was properly allocable to the permit, and when considering King's expenses in obtaining the permit, Tamer determined that the current net value to King of the landfill permit was a loss of $171,251.25. At trial, King testified to the various expenses he incurred in trying to obtain the landfill and the permit which were referenced by Tamer in his testimony. King also discussed the various legal services and dates those services were provided by Fetterman, Dillard, and Overbey.

Following the trial, the Trial Court issued a thorough Opinion setting forth its numerous findings. The Trial Court began by concluding that the quantum meruit value to King of Fetterman's services was $350,000. The Trial Court then explained precisely how it reached this conclusion. The Trial Court detailed the various legal services performed by Fetterman once he began representing King. The Trial Court also concluded that the "witnesses called and exhibits used [at the successful trial] were all proof that had been developed by Fetterman." The Trial Court added:

I find the testimony of Judge Cotton regarding this case to be revealing. I believe that he did indeed find that the lawsuit took real impetus after Dillard became involved. Dillard was clearly the more experienced and talented trial attorney. His amendments to the complaint convinced the opponents that they had an adversary to be feared. I also find Judge Cotton's testimony about the courage of Fetterman to be involved in this "bad" case. Indeed it appears that virtually every person and entity in Scott County was against the landfill including churches and all the towns.

It appears that the opposition was so strong in this community that Fetterman's employment as a public defender was a campaign issue in the 1992 election. The District Public Defender elected in August, 1992 ran on a platform that none of her employees would be involved in the landfill litigation. She exacted from Fetterman a pledge that if he was hired he would not be involved. Even though he agreed with this ultimatum I find that he only stepped back from arguing the already prepared case at the motion hearing and one day trial....

I find the testimony of Jeffrey [Kendall], CEO of Liberty Waste quite credible. According to him the real asset which was purchased in August, 1998, was the already approved permit. According to him the land and other assets were of minimal value and he was of the opinion that the value of the permit was in excess of $4,000,00.00. ... I find that [Fetterman] solely was responsible for the identification of all witnesses who testified; took all depositions and discovery and essentially prepared the case for the one day trial which Dillard and [Overbey] conducted while Fetterman was in the audience. I further find that Fetterman initiated the process for permit approval; engaged necessary experts and spent considerable time and effort guiding this application through the necessary legal proceedings. All of these efforts were in a small community where the landfill was extraordinarily unpopular. Fetterman's services were of substantial benefit to King and formed the basis upon which the ultimate favorable judgment was secured.

I further find that all of the amendments which were filed by Dillard were dismissed at trial and that judgment was entered for King based upon the relief originally pled by Fetterman.

I have considered the testimony of Herbert Tamer regarding the net value to King and do not believe that he has considered the true value to King of the judgment entered. I believe that the value of the permit is substantially greater than the value he used and that he failed to consider that without the favorable judgment the other assets sold were of minimal value. He also assigned all costs to the permit without assessing costs to all assets conveyed. ...

I have also considered the opinions expressed by attorneys Webster and Scott. I find that both recognized that value was received by King but that the $800,000.00 value found by Webster is too high and the $75,000.00 value found by Scott is substantially low.

I further find that this is an appropriate case for the award of prejudgment interest. The plaintiff is awarded interest at 10% simple per annum from September 23, 1998.

When making its ruling, the Trial Court made specific findings on credibility as well as determinations regarding the weight to be given the testimony of the various expert witnesses. In *Wells v. Tennessee Bd. of Regents,* 9 S.W.3d 779 (Tenn. 1999), the Supreme Court noted that trial courts are better situated than appellate courts to evaluate the credibility of witnesses. "Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells,* 9 S.W.3d at 783. Similarly, when oral expert testimony is presented, resolving conflicting expert testimony falls "within the province of the trier of fact ... and where an expert witness's testimony is supported by the evidence and the trier of fact credits that testimony over others, there is no basis to reverse the court's findings." *Atkins v. State,* No. E2003–01255–COA–R3–CV, 2004 WL 787166, at *5 (Tenn.Ct.App. Apr. 14, 2004), *no appl. perm. appeal filed.* However, no presumption regarding credibility attaches when the testimony is admitted via deposition. *See e.g., Fritts v. Safety Nat. Cas. Corp.,* 163 S.W.3d 673, 679 (Tenn. 2005)("This Court, however, may draw its own conclusions about the weight and credibility to be given to expert testimony when all of the medical proof is by deposition.").

The Trial Court certainly was confronted with a wide array of proof at trial. Webster believed the quantum meruit value of Fetterman's services provided to King was $800,000, while Scott believed the quantum meruit value was $75,000. Likewise, the upper end of the value of the landfill permit was in excess of $4 million, while at the lower end the value was a net loss when considering the amount that has so far been paid. The Trial Court obviously gave considerable thought to its final judgment and carefully considered all of the relevant proof. Given the evidence in the record before us as discussed, the Trial Court's credibility determinations as to the witnesses who testified at the trial, and the presumption of correctness that attached to the Trial Court's factual findings, we reject King's argument that the evidence preponderates against the Trial Court's conclusion that the appropriate quantum meruit value was $350,000. When we remanded this case to the Trial Court, we instructed the Trial Court to determine the quantum meruit value of Fetterman's services and the Trial Court did just that. The judgment of the Trial Court takes into account, among other things, an appropriate reduction in the total fees awarded for any work that may have been performed while Fetterman also was employed as a public defender. Accordingly, we affirm the judgment of the Trial Court awarding the Estate a judgment of $350,000 for the legal services performed on King's behalf by Fetterman prior to Fetterman's untimely death.

The next issue concerns the Trial Court's award of prejudgment interest at the rate of 10% which was to be calculated beginning as of September 23, 1998. As set forth previously, the prejudgment interest amounted to $237,424.54. In *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998), our Supreme Court gave a thorough discussion of prejudgment interest awards stating, *inter alia:*

An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion....

Several principles guide trial courts in exercising their discretion to award or deny prejudgment interest. Foremost are the principles of equity. Tenn.Code Ann. § 47–14–123. Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing. *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn.1994); *Otis* [v. *Cambridge Mut. Fire Ins. Co.*], 850 S.W.2d [439] at 446 [ (Tenn.1992) ].

In addition to the principles of equity, two other criteria have emerged from Tennessee common law. The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds. *Mitchell*, 876 S.W.2d at 832. The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds. *Id.* (citing *Textile Workers Union v. Brookside Mills, Inc.*, 205 Tenn. 394, 402, 326 S.W.2d 671, 675 (1959)).

We note that these criteria, if strictly construed, could prohibit the recovery of prejudgment interest in the vast majority of cases....

[W]e find that if the existence or amount of an obligation is certain, this fact will help support an award of pre-judgment interest as a matter of equity. After all, the more clear the fact that the plaintiff is entitled to compensatory damages, the more clear the fact that the plaintiff is also entitled to prejudgment interest as part of the compensatory damages. The converse, however, is not necessarily true. The uncertainty of either the existence or amount of an obligation does not *mandate* a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable. The certainty of the plaintiff's claim is but one of many nondispositive facts to consider when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances.

*Myint,* 970 S.W.2d at 927–928.

In the present case, there is no doubt that the Estate has a valid claim against King for legal services rendered by Fetterman. The amount of that claim was uncertain to say the least, given that it has taken two trials and two appeals, at least so far, to get to this point. *If* the contract between Fetterman and King had been enforceable, the payment of Fetterman's attorney fees would have been made over time in the exact same manner that King was paid by Liberty Waste. Again assuming that the contract had been enforceable, then as of the date of this Opinion, Fetterman would have been due just over one-half of his total fees. Having said that, it is important to once again point out that the reason the contract was not enforceable was because Fetterman essentially had withdrawn from representing King. In short, the contract was unenforceable not because of King's actions, but Fetterman's. The prejudgment interest award as it now stands results in a significant and inequitable windfall to the Estate. While we do not believe that the Trial Court erred in awarding prejudgment interest, we believe the amount of interest is excessive given the equities of this case. We modify the award of prejudgment interest to 5%.

When the complaint was filed by the Estate in June of 1999, the complaint acknowledged that King already had deposited $250,000 into the General Sessions Court for Scott County, Probate Division. This money was deposited on October 15, 1998, and was payment for legal services performed by Fetterman. On remand, if the $250,000 was deposited into an interest bearing account and if this $250,000 plus interest earned on this $250,000 is paid to the Estate, then we do not believe it would be appropriate to award the Estate any additional prejudgment interest on that $250,000. The Trial Court should then determine the appropriate amount of prejudgment interest on the remaining $100,000 of the judgment, at the rate of 5% simple interest beginning as of September 23, 1998. If the $250,000 was not deposited into an interest bearing account, then the Trial Court should determine the amount of prejudgment interest on the entire $350,000 judgment at the rate of 5% simple interest and beginning as of September 23, 1998.

### Conclusion

The judgment of the Trial Court is affirmed as modified and this cause is remanded to the Trial Court for further proceedings consistent with this Opinion and for collection of the costs below. Costs on appeal are taxed one-half to the Appellant Johnny King, and his surety, and one-half to the Appellee, The Estate of Sherman Fetterman by Glenda Fetterman and Kendra Marlow.