DOG HOUSE INVESTMENTS, LLC

v.

TEAL PROPERTIES, INC., et al.

Court of Appeals of Tennessee, Western Section, at Nashville.

Nov. 20, 2013 Session.

Feb. 7, 2014.

Application for Permission to Appeal Denied by Supreme Court July 11, 2014.

David Lee Cooper, Nashville, Tennessee, for the appellants, Teal Properties, Inc. and Jerry Teal.

Rebecca Blair and John Bradfield Scarbrough, Brentwood, Tennessee, for the appellee, Dog House Investments, LLC.

## OPINION

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

The trial court entered judgment in favor of Plaintiff Lessee in this action for breach of contract and promissory fraud. It also awarded Plaintiff punitive damages and prejudgment interest at the rate of eight percent per annum. We affirm.

This dispute arises from damage to real property caused by the May 2010 floods throughout Nashville. Steve Lassiter (Mr. Lassiter) and Nancy Purvis (Ms. Purvis) are the sole members of Plaintiff Dog House Investments, LLC ("Dog House"). Dog House operates a dog "camp" facility on real property which it leases from Defendant Teal Properties, Inc. ("Teal Properties"). The five–year lease agreement ("the Agreement") executed by the parties in June 2008 provides, in relevant part:

FIRE. CLAUSE: In case the said premises shall be so damaged by fire or other cause as to be rendered untenantable, Lessor shall have thirty (30) days from the date of said casualty to determine the extent of repairs to be done and the time required to perform them. If the damage is such that repairs can be completed within ninety (90) days from commencement of said repairs, Lessor agrees to make such repairs promptly and to allow Lessee an abatement in rent for such time as the building remains untenantable. Lessor shall commence repairs within thirty (30) days from the date of said casualty. If neces-

sary repairs cannot be made within ninety (90) days from the date of commencement of such repairs, this lease shall terminate as of the date the premises were rendered untenantable. In the event of partial loss, tenant shall have the right to terminate this lease with no recourse.

The Agreement also contains a clause entitled UPKEEP OF PREMISES which provides, in part,

Lessor shall, as its own cost and expense, maintain in good repair the roof, foundations and exterior walls (not including doors, windows and floors); however, Lessor shall not be obligated to make any repairs of those portions of the premises that it is obligated to maintain unless it shall be notified in writing by Lessee, and Lessor shall then have a reasonable period of time to make such repairs.

It additionally provides that the Agreement may not be altered or modified except in writing.

As amended in May 2012,[1] Dog House filed a complaint against Teal Properties and Jerry Teal, individually (Mr. Teal; hereinafter collectively "Teal"), alleging that the property was owned by Mr. Teal, individually; that it was substantially damaged and made untenantable by flooding in Nashville on May 1 and 2, 2010; and that it immediately notified Teal of the untenantable conditions. It asserted that Mr. Teal visited the property on May 2, 2010, notified Mr. Lassiter by email that the property was covered by flood insurance, but took no steps to repair or restore the property. Dog House alleged that "[d]ue to the exigency of the circumstances and the potential for development of additional problems as time passed," it immediately began work to remove water from the

---

1. Dog House filed its initial complaint on May 2, 2011.

premises, and that Mr. Teal was aware of and relied on its efforts. It alleged that Teal agreed to submit a claim for insurance benefits at Dog House's urging, and that Teal "expressly understood" that Dog House was asking Teal to submit the claim to help recover the cleanup costs. Dog House asserted that, in reliance on Teal's promise to file an insurance claim to reimburse Dog House for repair costs, and because Teal did not take any measures to make repairs, Dog House continued efforts to remediate the property by engaging the assistance of third parties to remove water and make repairs. It asserted that these steps were undertaken with Teal's knowledge. Dog House alleged that it incurred expenses in excess of $39,000 to repair the property; that it submitted invoices and supporting documentation to Teal in June 2010; that Teal recovered more than $40,000 from its insurance carrier after submitting documentation of expenses incurred by Dog House; and that, despite direct inquires by Dog House, Mr. Teal concealed that Teal had received the insurance proceeds. Dog House alleged that Teal never intended to reimburse it for expenses incurred in repairing the property.[2] Dog House asserted claims for unjust enrichment, promissory fraud, breach of contract, and piercing the corporate veil. It prayed for compensatory damages in the amount of $39,000.00, punitive damages, prejudgment interests, and costs. It also prayed for judgment against Teal Properties and Mr. Teal jointly and severally, and for "further and other general relief."

Teal answered Dog House's amended complaint in June 2012. In its answer, Teal admitted the terms of the Agreement; that the property was damaged by floods in May 2010; that Mr. Teal visited the

property and sent the referenced email on May 2, 2010; and that it submitted an insurance claim and recovered payments from its flood insurance carrier. Teal denied that Dog House was entitled to any proceeds of the insurance recovery based on the terms of the parties' Agreement, however, and generally denied liability.

Following a hearing in November 2012, the trial court entered judgment in favor of Dog House on the basis of breach of contract, breach of implied contract, and promissory fraud in the amount of $35,191.28. It also found, by clear and convincing evidence, that Teal's conduct was fraudulent and intentional and that punitive damages accordingly were warranted. It awarded Dog House punitive damages in the amount of $10,000. The trial court found that Mr. Teal is the owner of Teal Properties and that Teal Properties "is merely a sham or dummy corporation and is the alter ego of Jerry Teal." It held Mr. Teal personally liable for the judgment, and awarded Dog House prejudgment interest in the amount of eight percent, totaling $6,143.03. The trial court denied Dog House's motion to alter or amend the judgment to increase the amount of punitive damages. The trial court entered judgment against Teal in the amount of $53,736.05 by final order entered January 25, 2013. Teal filed a timely notice of appeal to this Court and the matter was heard by the Western Section sitting in Nashville in November 2013.

## Issues Presented

Teal presents the following issues for our review, as stated by Teal:

(1) Did the trial court erroneously hold that Teal Properties, Inc. breached the written lease?

---

2. Dog House also made a claim regarding a roof leak and recovered damages in the amount of $543.75 on the claim. That award is not an issue in this appeal.

(2) Did the trial court erroneously hold that the Defendants breached an implied contract, when this theory of recovery was not raised by the pleadings?

(3) Did the trial court err by ruling that Defendants were liable for promissory fraud?

(4) In the alternative, if Defendants are liable for breach of a written or implied contract or for promissory fraud, should the trial court have reduced the judgment by $10,000, the amount of the deductible?

(5) Did the trial court err by awarding the Plaintiff punitive damages?

(6) Did the trial court erroneously pierce Teal Properties' corporate veil to hold Jerry Teal personally liable?

(7) Did the trial court abuse its discretion by setting the rate of prejudgment interest at 8% per annum?

### *Standard of Review*

We review the trial court's findings of fact *de novo* on the record, with a presumption of correctness, and will not reverse those findings unless the evidence preponderates against them. Tenn. R.App. P. 13(d); *Berryhill v. Rhodes,* 21 S.W.3d 188, 190 (Tenn.2000). Insofar as the trial court's determinations are based on its assessment of witness credibility, we will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn.2002). Our review of the trial court's conclusions on matters of law, however, is *de novo* with no presumption of correctness. *Taylor v. Fezell,* 158 S.W.3d 352, 357 (Tenn.2005). We likewise review the trial court's application of law to the facts *de novo,* with no presumption of cor-

rectness. *State v. Thacker,* 164 S.W.3d 208, 248 (Tenn.2005).

### *Discussion*

We begin our discussion of the issues presented by observing that the trial court made extensive and detailed findings at the conclusion of the November 2012 hearing of this matter and incorporated those findings into its judgment. We also note that the existence of the written lease agreement is not in dispute. Additionally, it is undisputed that May 2010 floods in Nashville caused extensive damage to the real property at issue in this matter; that Dog House incurred expenses in excess of $35,000 to repair flood damage; that Teal recovered more than $40,000 from its flood insurance carrier based on documentation provided by Dog House; and that Teal did not reimburse Dog House for expenses incurred to repair the real property. With these facts in mind, we turn to the issues raised for our review.

### *Breach of Lease Agreement/Implied Contract*

We turn first to whether the trial court erred by determining that Teal breached the parties' June 2008 lease agreement by failing to reimburse Dog House for amounts expended to repair the 2010 flood damage. The question presented by this issue, as we perceive it, is whether the terms of the written lease agreement required Teal to repair damages to the property caused by flooding.

In its brief, Teal relies on a 1921 Ohio case [3] for the proposition that the term "other cause" in the Fire Clause of the Agreement does not encompass acts of God, and that to interpret it as such would convert the clause into a strict liability clause, rendering it applicable to any event

---

**3.** *George H. Dingledy Lumber Co. v. Erie R.* *Co.,* 102 Ohio St. 236, 131 N.E. 723 (1921).

causing damage. Teal further asserts that, if the clause applied, Dog House first breached the lease when it began repairs without first gaining pre-approval from Mr. Teal. Dog House, on the other hand, asserts that the Fire Clause is not limited to fire damage only, but that the term "other cause" encompasses damage resulting from flooding.

The "cardinal rule" of contract construction is to ascertain the intent of the parties and to effectuate that intent consistent with applicable legal principles. *Frizzell Constr. Co. v. Gatlinburg, L.L.C.,* 9 S.W.3d 79, 85 (Tenn.1999). Our first task when construing a contract is to determine whether its language is ambiguous. *Planters Gin Co. v. Fed. Compress & Warehouse Co.,* 78 S.W.3d 885, 889–90 (Tenn.2002). It is well-settled that "[t]he interpretation of an unambiguous written contract generally is an issue of law." *Childress v. Union Realty Co.,* 97 S.W.3d 573, 577 (Tenn.Ct.App.2002) (citing *Hibernia Bank and Trust Co. v. Boyd,* 164 Tenn. 376, 48 S.W.2d 1084, 1086 (1932)).

A contractual term may be determined to be ambiguous, however, if it is "susceptible to more than one reasonable interpretation." *Planters Gin,* 78 S.W.3d at 890 (citation omitted). Ambiguity does not arise " 'merely because the parties may differ as to interpretations of certain of its provision[.]' " *Johnson v. Johnson,* 37 S.W.3d 892, 896 (Tenn.2001) (quoting *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc.,* 884 S.W.2d 458, 462 (Tenn.Ct.App.1994)). Rather, "[a] contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.' " *Planters Gin,* 78 S.W.3d at 890 (quoting *Empress Health & Beauty Spa, Inc. v. Turner,* 503 S.W.2d 188, 190–91 (Tenn.1973)).

Upon determining that a contract is ambiguous, the court must apply established rules of construction to determine the intent of the parties. *Id.* Tennessee courts adhere to the general rule that ambiguities in a contract are construed against the drafter. *Ralph v. Pipkin,* 183 S.W.3d 362, 367 (Tenn.Ct.App.2005) (citation omitted). It is well-settled that parol evidence regarding "the relations existing between the parties, the facts surrounding them at the time when they entered into the agreement, and also their acts subsequent thereto" may be considered by the court when interpreting an ambiguous contractual provision. *Faulkner v. Ramsey,* 178 Tenn. 370, 158 S.W.2d 710, 711 (1942); *see also Stonebridge Life Ins. Co. v. Horne,* No. W2012–00515–COA–R3–CV, 2012 WL 5870386, at \*8 (Tenn.Ct.App. Nov. 21, 2012) (quoting 45 C.J.S. Insurance § 573 (footnotes omitted)).

When a contract is determined to be ambiguous after application of the rules of construction, then the interpretation of the contract becomes a question of fact for the finder of fact. *Planters Gin,* 78 S.W.3d at 890. As this Court recently observed:

A lease is a contract and should be governed by the general contract principles of good faith and commercial reasonableness. *Dick Broadcasting Co., Inc. of Tennessee v. Oak Ridge FM, Inc.,* 395 S.W.3d 653, 664 n. 6 (Tenn. 2013) (citation omitted). When interpreting a contract, courts must always be careful to give a reasonable and equitable construction. *Hathaway v. Hathaway,* 98 S.W.3d 675, 679 (Tenn.Ct.App. 2002). "[I]t is well settled that '[a] qualifying word which must be read into every contract is the word 'reasonable' or its equivalent 'reasonably'.' " *Id.* at 678–79 (quoting *Minor v. Minor,* 863 S.W.2d 51, 54 (Tenn.Ct.App.1993)).

Thus, the extent of parties' obligations under a contract should be tempered by a reasonableness standard. *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 198 (Tenn.Ct.App.1990). *1963 Jackson, Inc. v. De Vos*, 436 S.W.3d 278, 290 (Tenn.Ct.App.2013)(*perm. app. pending* ).

In his brief, Teal references paragraph 18 of the parties' Agreement in support of his assertion that Dog House failed to notify Teal in writing of any needed repairs, and thus Teal was not obligated to make repairs following the flood damage. Although Teal asserts that paragraph 19, the "Fire Clause," is not applicable to flood damage, he asserts that, if it is applicable, Dog House failed to provide Teal thirty days from the date of casualty to determine the extent of repairs to be done as required by the clause.

The term "other cause" may be reasonably interpreted more than one way, but is clearly not limited exclusively to fire damage where "damage by fire" is explicitly referenced in the clause. "Other cause," therefore, clearly references damage other than by fire. Upon review of the record, we agree with the trial court that the parties' course of conduct evidences that they construed and intended the Fire Clause to be applicable to the flood damage in this case. We observe that the clause encompasses fire and "other causes" that would render the property "untenantable." Additionally, the clause provides that Lessor/Teal "shall commence repairs *within* thirty (30) days from the date of said *casualty*." (Emphasis added.) It is not disputed that Mr. Teal inspected the property on May 2 and had actual knowledge of the damages. Additionally, undisputed communication between the parties contained in the record demonstrates that Mr. Teal advised Mr. Lassiter and Ms. Purvis to "clean up" and indicated that the costs would be covered by flood insurance. In his May 2, 2010, email, Mr. Teal wrote, "Once the water recedes, you can clean up fairly easy.... Please be optimistic.... I will check on insurance later today. But thank God I have flood insurance." On May 7, Mr. Teal informed Ms. Purvis that he would visit the property with the FEMA adjuster.

On June 4, Mr. Lassiter submitted invoices and receipts to Mr. Teal "for his records and to submit to [his] insurance," and informed Mr. Teal that "everything [had] already been paid except Servpro." On October 7, Mr. Lassiter forwarded an updated, reduced Servpro invoice to Mr. Teal and wrote, "If you or the adjuster have any questions about this invoice please feel free to call me anytime." In his response to Mr. Lassiter the same day, Mr. Teal wrote, "The adjuster will contact Servpro directly." Mr. Lassiter emailed Mr. Teal on October 14 to inquire as to whether he had received "[a]ny word from the adjuster[.]" Mr. Teal responded, "No. Nothing yet. I'll let you know." On October 14, Mr. Lassiter informed Mr. Teal that Dog House had reached its "financial breaking point" and would "need to discuss differed rent payments" pending resolution of the matter. Mr. Teal responded the same day, suggesting that Mr. Lassiter "do something else besides pounding on [him]" and also suggesting that Mr. Lassiter, "be patient, especially since I am the one that made the premium payments on the insurance that I do have." It is undisputed that Mr. Teal submitted Dog House's invoices and documentation to his flood insurance carrier, that he received several insurance payments based on that documentation in 2010 and 2011, and that he did not reimburse Dog House for expenses incurred to repair the flood damage. Additionally, Mr. Teal testified in his deposition that he did not "deny[ ]" that he

told Ms. Purvis and Mr. Lassiter in July 2011 that he had not received any insurance proceeds, and testified that he continued to tell them that he was "[s]till working on it."

We agree with the trial court that the parties' course of conduct indicated that they intended "other cause" in paragraph 19 of their Agreement to include flood damage. The record also supports the trial court's conclusion that the manner in which Teal would fulfill its agreement to make repairs was not a "detailed subject of the contract" and that Mr. Teal's instructions to Mr. Lassiter and Ms. Purvis to begin cleaning up and making repairs themselves did not result in a modification of the Agreement. We accordingly affirm the trial court's conclusion that paragraph 19 of the parties' Agreement included flood damage and that the parties agreed that repairs would be undertaken by Dog House and reimbursed by Mr. Teal. We also affirm the trial court's determination that Mr. Teal breached the contract by failing to reimburse Dog House for the expenses it incurred. We affirm judgment in favor of Dog House on this issue. In light of this holding, we find it unnecessary to address the trial court's alternative judgment in favor of Dog House on the basis of an implied contract.

### The Deductible

■ We next turn to whether the trial court erred by not reducing the amount of the compensatory damages awarded to Dog House by $10,000.00, the amount of the deductible applicable to Teal's policy of insurance. Although Mr. Teal asserts that he did not promise Mr. Lassiter or Ms. Purvis that he would reimburse them for their flood-related expenses, he nevertheless asserts that Mr. Lassiter offered to pay his insurance deductible. Teal further asserts that the judgment should have

been reduced by the amount of the deductible because any alleged promise was made to pay for flood-related expenses from proceeds of insurance for which Mr. Teal paid the premiums. Dog House denies that the judgment should have been reduced and asserts that Teal cannot raise this issue on appeal where it was not raised in the trial court. In his reply brief, Teal asserts that it was unnecessary to raise the issue of the amount of the judgment in the trial court where it is not an affirmative defense which must be asserted.

■ Upon review of the record, we agree with Dog House that Teal did not raise this issue in the trial court. It is well settled that issues and arguments not raised or asserted in the trial court may not be raised for the first time on appeal. *Barnes v. Barnes,* 193 S.W.3d 495, 501 (Tenn.2006); *Moss v. Shelby County Div. of Corr.,* No. W2013–01276–COA–R3–CV, 2013 WL 6529567, at *4 (Tenn.Ct.App. Dec. 11, 2013). This argument is without merit.

### Promissory Fraud and Punitive Damages

■ In contrast to compensatory damages, which are designed to compensate a plaintiff, "punitive damages are intended to 'punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him.'" *Goff v. Elmo Greer & Sons Constr. Co.,* 297 S.W.3d 175, 187 (Tenn.2009)(quoting *Huckeby v. Spangler,* 563 S.W.2d 555, 558–59 (Tenn.1978)). "Punitive damages are thus appropriate only in the most egregious cases and, consequently, a verdict imposing such damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly." *Id.* (citation omitted). Punitive damages generally are not available in an action for breach of

contract, but may be awarded only in the most egregious circumstances. *Rogers v. Louisville Land Co.,* 367 S.W.3d 196, 211 n. 14 (Tenn.2012); *Hillhouse v. McDowell,* 219 Tenn. 362, 410 S.W.2d 162, 164 (1966); *Next Generation, Inc. v. Wal–Mart, Inc.,* 49 S.W.3d 860, 866 (Tenn.Ct.App. 2000)("[I]n the absence of fraud, there is no basis for punitive damages[.]").

We cannot say that the breach of contract in this case rises to the level of egregiousness necessary to sustain an award of punitive damages absent a finding of fraud. Accordingly, although the compensatory judgment may be sustained on the breach of contract claim standing alone, we turn to whether the record supports an award of punitive damages based on Dog House's claim for promissory fraud.

 Actions for fraud contain four primary elements: (1) intentional misrepresentation of a material fact; (2) knowledge that the representation was false— that the misrepresentation was made knowingly or recklessly or without belief or regard for its truth; (3) reasonable reliance on the misrepresentation by the plaintiff and resulting damages; (4) "that the misrepresentation relates to an existing or past fact[.]" *Stacks v. Saunders,* 812 S.W.2d 587, 592 (Tenn.Ct.App.1990) (citations omitted). If the claim is one for promissory fraud, "then the misrepresentation must 'embody a promise of future action without the present intention to carry out the promise[.]'" *Id.* (quoting *Keith v. Murfreesboro Livestock Mkt., Inc.,* 780 S.W.2d 751, 754 (Tenn.Ct.App.1989)(citing *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585, 590 (Tenn.Ct.App.1980))). "'When a promise is made in good faith, with the expectation of carrying it out, the fact that it subsequently is broken gives rise to no cause of action, either for deceit, or for equitable relief. Otherwise any

breach of contract would call for such a remedy.'" *Houghland v. Security Alarms & Servs., Inc.,* 755 S.W.2d 769, 774 (Tenn.1988)(quoting *Prosser and Keeton on The Law of Torts,* § 109 (5th ed.1984)). "Fraud is never presumed, and where it is alleged facts sustaining it must be clearly made out." *Homestead Group, LLC. v. Bank of Tennessee,* 307 S.W.3d 746, 751 (Tenn.Ct.App.2009).

We begin our discussion of the trial court's judgment on this issue by noting that the trial court specifically found Mr. Teal to not be credible. The trial court found that Mr. Teal was paid insurance proceeds on at least three occasions; that he concealed these payments; and that, contrary to his testimony, he did not hold them in reserve in order to reimburse FEMA if so required, but used them to pay other debts. The trial court also found that Teal's conduct placed Dog House in "a dire financial situation"; that Mr. Teal was aware that his refusal to reimburse Dog House was causing them to be "close to bankruptcy"; and that Teal "profited from the activity in that he was able to pay his bills and comfortably move on with his business life while riding on the backs of the plaintiffs who had done all of the hard work."

 The question of intent is a question of fact for the finder of fact. *Harber v. Bank of Am., NA,* 274 S.W.3d 649, 655 (Tenn.Ct.App.2008) (citation omitted). The evidence does not preponderate against the trial court's conclusion in this case that Mr. Teal knowingly misrepresented to Dog House that he would pay for repairs with insurance proceeds without the concurrent intent to fulfill the promise. The trial court found that

[d]uring his several visits immediately after the flood, Mr. Teal directed the plaintiff that the plaintiff should use its employees to clean up and that things

would go more quickly if this was done. This was a point of impasse. . . .

Although Mr. Jerry Teal was hesitant to submit claims under the flood policy, he did agree with the plaintiff to do so when the plaintiff explained they could no longer advance the cleanup expense and may even have to file bankruptcy. Thus, the trial court determined that Dog House relied on Mr. Teal's promise to reimburse it for the costs of repairs from the insurance proceeds should Dog House use its own resources to undertake repairs. We affirm the trial court's finding of promissory fraud in this matter.

■■■ We also affirm the trial court's determination that clear and convincing evidence supports a finding in this case that Mr. Teal's fraudulent actions were intentional and knowing. As discussed above, the record in this case demonstrates that the parties' lease agreement obligated Mr. Teal to make the property "tenantable" following fire damage or damage by "other cause"; that he directed Dog House to clean up and repair the property using its own resources; that he agreed to file a claim with his flood insurance carrier in response to Dog House's financial concerns; that he made an insurance claim on the basis of Dog House's documented expenses; that he received the insurance proceeds, including an advance as early as June 2010; that he utilized the insurance proceeds to pay other expenses; that he concealed the fact that he received insurance proceeds from Mr. Lassiter and Ms. Purvis; and that he did not reimburse Dog House for the cost of repairs. The record demonstrates that Mr. Teal engaged in a pattern of deceit, stringing Ms. Purvis and Mr. Lassiter along with promises that he was "working on" the matter while, in the words of the trial court, "aware of the amount of harm that he was causing because he knew that

the plaintiffs were close to bankruptcy or in dire financial situation" as a result of his intentional and knowing fraudulent acts. The characterization of Teal's acts with respect to his insurance carrier are beyond the scope of this lawsuit.

■■■ In non jury trials, the trial judge's findings of fact and conclusions of law must clearly set forth the reasons for assessing punitive damages and clearly demonstrate consideration of all relevant factors. *Culbreath v. First Tennessee Bank Nat'l Ass'n,* 44 S.W.3d 518, 528 (Tenn. 2001). The trial court addressed the relative factors in its oral ruling which was incorporated into the Order Entering Judgment. The factors are set forth in *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901–02 (Tenn.1992). We affirm the award of punitive damages in this case.

### *The Corporate Veil*

■■■ We turn next to whether the trial court erred by piercing Teal Properties' corporate veil so as to make Mr. Teal and Teal Properties jointly and severally liable for the judgment in favor of Dog House. It is well-settled that courts may pierce the corporate veil and "attribute the actions of a corporation to its shareholders" when appropriate. *CAO Holdings, Inc. v. Trost,* 333 S.W.3d 73, 88 (Tenn.2010). A party seeking to pierce the corporate veil bears the burden of demonstrating that "the separate corporate entity 'is a sham or dummy' or that disregarding the separate corporate entity is 'necessary to accomplish justice.'" *Id.* (quoting *Oceanics Sch., Inc. v. Barbour,* 112 S.W.3d 135, 140 (Tenn.Ct.App.2003)). When determining whether piercing the corporate veil is appropriate, the court must consider whether the corporate "entity has been used to work a fraud or injustice in contravention of public policy" and also:

(1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 215 (Tenn.2012) (citations omitted). No single factor is conclusive and not every factor must exist to pierce the corporate veil. *Id.; Trost,* 333 S.W.3d at 89. The question depends on the specific facts and circumstances of the case. *Id.* "[T]he equities[,]" however, must "substantially favor the party requesting the court to disregard the corporate status." *Trost,* 333 S.W.3d at 89 (citation omitted). "[T]he presumption of the corporation's separate identity should be set aside only 'with great caution and not precipitately.'" *Rogers,* 367 S.W.3d at 215 (quoting *Schlater v. Haynie,* 833 S.W.2d 919, 925(Tenn.Ct.App.1991)). The matter is "particularly within the province of the trial court" and the question of whether the corporate entity is a "mere instrumentality of an individual or a parent corporation" is a question of fact for the finder of fact. *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.,* 691 S.W.2d 522, 526 (Tenn.1985).

In this case, Mr. Teal denied personal liability but admitted in his answer that he owned the property leased by Dog House in Nashville. The trial court found that Teal Properties owns no property, has no assets, and "has no cash except that which is deposited by Mr. Jerry Teal when he has the opportunity to do so"; that Teal Properties receives rents and immediately pays it out to pay Mr. Teal's financial obligations; that Mr. Teal is the sole stockholder of Teal Properties and owns the corporation; and that Teal Properties has no purpose other than to collect the rent on properties owned by Mr. Teal. The trial court also found that Mr. Teal does not receive a salary from Teal Properties but utilizes its assets, including the flood insurance proceeds at issue in this case, to pay Mr. Teal's "personal expenses and his personal obligations." The trial court found that Mr. Teal did not maintain an arms-length relationship with the corporation, and that it was, in fact, his alter ego. Mr. Teal does not dispute these findings with any particularity in his brief to this Court, but asserts that "[t]here is no proof that Teal Properties is a sham or dummy corporation . . ." We discern no error on the part of the trial court and affirm on this issue.

### Prejudgment Interest

█ We finally turn to the award of prejudgment interest in this matter. Teal asserts the trial court abused its discretion by setting the rate of prejudgment interest awarded to Dog House at eight percent per annum. Teal asserts that setting the prejudgment interest at eight percent "did not make sense" where it is more than the 5.25 percent post judgment interest rate applicable in this case. Teal further asserts that the rate set by the trial court is inequitable where the prime loan rate since June 2010 has been 3.25 percent.

Tennessee Code Annotated § 47–14–123 permits an award of prejudgment interest not to exceed ten percent per annum. The purpose of prejudgment interest is not punitive, but to fully compensate a prevailing plaintiff for the loss of the use of those funds to which he was entitled. *E.g., Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn.1998). Equity must be the trial court's guiding principle when determining whether an award of prejudgment interest is warranted. *Id.* Some of the equitable principles which may be considered include whether the amount owed by the defendant was easily ascertainable, whether the plaintiff unreasonably delayed filing suit, whether the plaintiff delayed the proceedings after filing the action, whether the defendant had full access to and use of the money, and whether the plaintiff has been otherwise compensated for the loss of use of the funds. *Scholz v. S.B. Intern., Inc.,* 40 S.W.3d 78, 84 (Tenn.Ct.App.2000). An award of prejudgment interest is within the sound discretion of the trial court, and we will not disturb the trial court's determination absent "a manifest and palpable abuse of discretion." *Myint,* 970 S.W.2d at 927(citations omitted).

As Teal asserts in his brief, we have affirmed prejudgment interest awards set at less than ten percent. *E.g., Mabey v. Maggas,* No. M2006–02689–COA–R3–CV, 2007 WL 2713726 (Tenn.Ct.App. Sept. 18, 2007). We have also affirmed recent prejudgment interest awards at the statutory rate of ten percent as being within the trial court's discretion. *E.g., Teague v. Kidd,* No. E2011–02363–COA–R3–CV, 2012 WL 5869637, at *10 (Tenn.Ct.App.2012)(*no perm. app. filed*). Although, as Teal asserts, we modified the award of prejudgment interest from ten percent to five percent in *Estate of Fetterman ex rel. Fetterman v. King,* we did so upon determining that the amount was excessive where the action was one awarding the estate of a deceased attorney legal fees for service provided prior to the attorney's death, the amount of the claim was uncertain, the contract between the attorney and client was unenforceable, and litigation of the matter took two trials and two appeals. *Estate of Fetterman ex rel. Fetterman v. King,* 206 S.W.3d 436, 447 (Tenn.Ct.App.2006). In Fetterman, we observed that a prejudgment interest award in the amount of ten percent would result "in a significant and inequitable windfall" to the plaintiff. *Id.* Those circumstances are not present in this case. Finding no abuse of discretion on the part of the trial court, we affirm the trial court's award of prejudgment interest at the rate of eight percent.

### *Holding*

In light of the foregoing, we affirm the judgment of the trial court in its entirety. Dog House's "alternative issue" on cross appeal is pretermitted as unnecessary in light of this holding. Costs on appeal are taxed to the Appellants, Teal Properties, Inc. and Jerry Teal, and their surety, for which execution may issue if necessary. This matter is remanded to the trial court for enforcement of the judgment and the collection of costs.